UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 11-54788

WATERFORD HOTEL, INC.,                              Chapter 11

         Debtor.                               Judge Thomas J. Tucker
_____/

**OPINION REGARDING CONFIRMATION OF DEBTOR'S FOURTH AMENDED
PLAN OF REORGANIZATION**

This case is before the Court on confirmation of Debtor Waterford Hotel, Inc.'s ("Waterford Hotel's" or "Debtor's") Fourth Amended Plan of Reorganization, filed on March 11, 2012 (the "Fourth Amended Plan" or the "Plan").[1] Several parties filed objections to confirmation, but all such objections have since been resolved by settlement, except those of one creditor. The only unresolved objections to confirmation are by an unsecured creditor, Farook Ammori ("Ammori").[2] Ammori's claim is "approximately $179,902.21 based upon Debtor's breach of a settlement agreement and personal guaranty."[3] Ammori argues that the Plan cannot be confirmed because (1) the Plan's treatment of the claims of unsecured creditors is ambiguous; (2) the Plan does not propose to pay a market rate of interest, or any interest at all, to unsecured creditors; (3) the Plan is not feasible; (4) the Plan is not proposed in good faith; and (5) the Plan is not "fair and equitable" because it "violates the absolute priority rule."[4] For the reasons stated

---

[1] Docket # 122.

[2] Docket # 141.

[3] *See* Docket # 141 at 1; Claim No. 4-1.

[4] Docket # 141 at 2. There is an outstanding issue on whether the Court should overrule some of Ammori's objections as untimely filed. In an Order filed on July 2, 2012, the Court has previously deemed, as *timely* filed, Ammori's objections "that: (1) Debtor has not proposed its plan in good faith, as required by 11 U.S.C. § 1129(a)(3); and (2) Debtor's Plan does not meet the requirement of 11 U.S.C.

in this opinion, the Court will overrule Ammori's objections and confirm Debtor's Plan, subject to certain pre-conditions stated below.

## I. Background

The Debtor Waterford Hotel filed a voluntary petition for relief under Chapter 11 on May 25, 2011.[5] As Debtor says in its Plan, "[Waterford Hotel] is a Michigan corporation which owns and operates a Holiday Inn Express [hotel franchise] in Waterford Michigan."[6] Jamal Kalabat ("Jamal") and Salam Kalabat ("Salam") are brothers, who each own 50% of Waterford Hotel.[7] Jamal and Salam have each filed their own individual Chapter 7 case, and received a discharge.[8]

On November 1, 2011, Debtor filed a third amended plan (the "Third Amended Plan").[9] Secured Creditor Dawn-G, LLC ("Dawn-G"),[10] the Internal Revenue Service, and the United

---

§ 1129(a)(11) (sometimes referred to as the "feasibility" requirement)." (*See* "Order Regarding Creditor Farook Ammori's Objections to Confirmation" (Docket # 146) at 1.) In that same order, however, the Court "reserve[d] for a ruling in the future, . . . whether the Court should overrule Mr. Ammori's *other* objections to confirmation as untimely." (*Id.*) The Court now rules that the other objections should not be overruled as untimely. No party has argued otherwise; the Court raised this issue on its own. And the Debtor has expressly declined to argue untimeliness as a basis for overruling any of Ammori's objections to confirmation. *See* Tr. of July 2, 2012 hearing (Docket # 172) at 6-7.

[5] Docket # 1.

[6] Docket # 122 at 20.

[7] *Id.*

[8] Jamal filed a voluntary petition for relief under Chapter 7 on July 29, 2011 (Case No. 11-60667) and received a discharge on November 15, 2011 (Docket # 45 in Case No. 11-60667), and Salam filed a voluntary petition for relief under Chapter 7 on August 1, 2011 (Case No. 11-60831) and received a discharge on December 16, 2011 (Docket # 59 in Case No. 11-60831).

[9] Docket # 94.

[10] Dawn-G is the holder of a promissory note, dated March 30, 2007, in the principal amount of $5,000,000.00 ("Note"). The Note provides for monthly installment payments of principal and interest in the amount of $29,977.53 beginning on May 1, 2007, at a 6% interest rate, with a balloon payment of principal and accrued, but unpaid interest, due 10 years later on April 1, 2017. (Promissory Note (Ex. A of Docket # 69) at 1. The Note also requires a payment of interest only in the amount of $1,666.67 on

2

States Trustee filed objections to confirmation of Debtor's proposed Third Amended Plan.[11] Dawn-G also filed a motion for relief from the automatic stay (the "Stay-Relief Motion").[12] Ammori had filed objections to an earlier version of Debtor's Plan.[13]

The Court held an initial hearing on the Stay-Relief Motion on December 14, 2012 and decided to adjourn the matter until the confirmation hearing on Debtor's Third Amended Plan,[14] which was the operative proposed plan at that time. On January 4, 2012, the Court held an initial non-evidentiary hearing on confirmation of Debtor's Third Amended Plan, and a further hearing on the Stay-Relief Motion. The Court then scheduled the two matters for an evidentiary hearing.

**A. The Fourth Amended Plan**

On March 11, 2012, before the evidentiary hearing began, Debtor filed a Fourth Amended Plan.[15] The Plan is a 10-year Plan, which treats claims in five different classes.

The Plan, as modified by a recent settlement between Debtor and Dawn-G, treats the

---

the date of funding. (*Id.*) The Note is secured by a perfected second priority mortgage on Debtor's real property located at 4350 Pontiac Lake Road, Waterford, MI 48328, and a perfected first priority security interest on all of Debtor's personal property, which includes an assignment of rents, all sums on deposit with Dawn-G, and all fixtures, chattels, accounts, equipment, inventory, contract rights, and general intangibles. Jamal and Salam each signed limited personal guarantees regarding the Note. But their obligations on those personal guarantees were discharged in their respective Chapter 7 cases. Dawn-G filed a proof of secured claim in the amount of $5,679,291 based on the Note. Dawn-G later made an election under 11 U.S.C. § 1111(b)(2). (*See* Plan (Docket # 122); Dawn-G's "Objection to Third Amended Debtor's Combined Disclosure Statement and Plan of Reorganization and Related Relief" (Docket # 97).)

[11] Docket ## 95 (the Internal Revenue Service), 97 (Dawn-G), and 98 (United States Trustee).

[12] Docket # 69.

[13] Docket ## 90, 91.

[14] Docket # 94.

[15] Docket # 122.

claim of Dawn-G in Class 1,[16] and proposes to pay Dawn-G $3,200,000.00, plus interest at the rate of 6.5% per year.[17] Under the Plan, Dawn-G will be paid $25,000.00 "within 72 hours of entry of an Order Confirming Debtor's Plan, as amended[,] to be applied to principal pursuant to the [Stipulated S]ettlement [A]greement."[18] Debtor must also make monthly payments in the amount of $20,226.18 to Dawn-G.[19] Debtor must pay the balance owing on the debt "in full by the first day of the eighteenth . . . month following the effective date."[20] Dawn-G will retain its lien until Debtor has fully paid its debt to Dawn-G under the terms of the Stipulated Settlement Agreement.[21]

The Plan proposes to treat Ammori's unsecured claim in the amount of $179,902.21 in Class 2, which consists of general unsecured claims in the total amount of $650,402.21. In addition to Ammori's claim, Class 2 includes the deficiency claim of secured creditor Lawrence Yaldoo ("Yaldoo") in the amount of $300,000, and $170,500 in other scheduled unsecured claims. (The secured claim of Yaldo in the amount of $300,000 is treated in Class 3 as wholly unsecured.) The Plan proposes to pay the general unsecured creditor class 1% of the face value

---

[16] The proposed treatment of Dawn-G's claim under the Plan is in a stipulated agreement between Debtor and Dawn-G, filed on May 10, 2013 (Docket # 200, the "Stipulated Settlement Agreement"), which resolved Dawn-G's objections to confirmation of Debtor's Plan (Docket # 97) and its Stay-Relief Motion (Docket # 69). By order of the Court, dated May 10, 2013, the terms of the Stipulated Settlement Agreement were approved and incorporated into Debtor's Plan ("Order Regarding Stipulation Resolving Dawn-G LLC's Objection to Confirmation and Resolving Motion for Relief From Stay" (Docket # 201).)

[17] Stipulated Settlement Agreement (Docket # 200) at pdf. 1 ¶ (3), 8 ¶¶ 7.B, 7.b.3.

[18] *Id.* at pdf. 2 ¶ (4), 8 ¶ 7.B.1.

[19] *Id.* at pdf. 1-2 ¶ (3), 8 ¶ 7.B.2.

[20] *Id.* at pdf. 2 ¶ (3), 9 ¶ 7.B.4.

[21] *See id.* at pdf. 11 ¶ 11.

4

of the claims in 240 equal monthly installments, without interest, which translates into a payment of $27.10 per month.[22]

The Plan proposes to treat the claims of Debtor's equity security holders in Class 4, in one of two alternative ways. As it turns out, only the first alternative applies. Because, as discussed below, all impaired classes have voted to accept the Plan, Debtor's two shareholders, Jamal and Salam, will retain their interests, and all of their rights will be unimpaired.[23]

Class 5 consists of the secured claim of "Oakland County/Waterford DPW" in the amount of $42,872.08, for unpaid water bills and taxes. The Plan provides, in relevant part, that this claim is to be paid in full, in 60 monthly payments of $953.67 at a 12% interest rate.

Monthly payments to all classes under the Plan will begin on the 11th calendar day after an order confirming the Plan becomes a final order (the "Effective Date"). All of the creditor classes are impaired under the Plan.

The Plan provides for the Debtor's assumption of its franchise agreement with the franchisor, Holiday Inn Express.[24] Under the franchise agreement, Debtor is required to complete a property improvement plan ("PIP") over a three-year period, which involves rebranding and a renovation of the hotel, at an estimated cost of between $630,000.00 and $760,000.00.[25] The PIP was prepared and negotiated based on a rigorous inspection of the hotel

---

[22] Fourth Amended Plan (Docket # 122) at 9.

[23] *Id.* at 10.

[24] *Id.* at 17 ¶ 10.1.

[25] *See* Dawn-G's Objection to Debtor's Third Amended Plan (Docket # 97 at 2 ¶ 10 (stating that Debtor must spend $760,000.00 ($160,000 in rebranding and $600,00 in re-franchising") on the PIP based on Jamal's testimony at the June 30, 2011 first meeting of creditors); Debtor's Br. in Supp. of Confirmation and in Opp'n to Relief From Stay (Docket # 179) at 1 (estimating the cost of the PIP at

5

by experienced professionals from the franchisor.[26]

## B. The acceptance of the Plan by all classes

Class 1 (Dawn-G) initially voted to reject the Plan.[27] However, due to the recent Stipulated Settlement Agreement, which resolved Dawn-G's objections to the Plan and the Stay-Relief Motion, the Court now deems Dawn-G to have accepted the Plan, as modified by the settlement.[28] Class 2 (general unsecured creditors, including the claim of Ammori); Class 3 (the secured claim of Yaldoo, which is wholly unsecured, and is to be paid with Class 2 general unsecured creditors); Class 4 (Equity Interests); and Class 5 (Oakland County/Waterford DPW), all voted to accept the Plan.[29] Therefore, all classes have now accepted the Plan.

## C. The evidentiary hearing

The State of Michigan, Department of Licensing & Regulatory Affairs, Unemployment Insurance Agency (the "Agency") and Ammori filed objections to Debtor's Fourth Amended Plan.[30] (The Agency's objections have since been resolved.)[31] The Court deemed the Debtor's

---

approximately $630,000 less work that has already been completed"); "Debtor's Brief Regarding Confirmation" (Docket # 120) at 3 (estimating the amount that Debtor must spend under the PIP to be between $600,000 and $750,000).

[26] Tr. of 7/10/2012 hearing (Docket # 177) at 138-40.

[27] "Amended Ballot Summary and Summary Regarding Status of Objections" (Docket # 106); "Objection to Third Amended Debtor's Combined Disclosure Statement and Plan of Reorganization and Related Relief" (Docket # 97 ); the Stay-Relief Motion (Docket # 69).

[28] *See* Stipulated Settlement Agreement (Docket # 200); "Order Regarding Stipulation Resolving Dawn-G LLC's Objection to Confirmation and Resolving Motion for Relief from Stay" (Docket # 201).

[29] "Amended Ballot Summary and Summary Regarding Status of Objections" (Docket # 106).

[30] Docket # 180 (the "Agency"), Docket ## 126, 139, 141 (Ammori).

[31] Debtor's counsel so stated at the beginning of his closing argument on August 28, 2012.

6

Third Amended Plan to be replaced by Debtor's Fourth Amended Plan,[32] and held a lengthy evidentiary hearing on confirmation of Debtor's Fourth Amended Plan and on Dawn-G's Stay-Relief Motion. The Court heard testimony on the value of Dawn-G's collateral from Dawn-G's expert, Bryan Younge ("Dawn-G's Appraiser"), and from Debtor's expert Paul Ghraib ("Debtor's Appraiser"). The Court also heard testimony on the appropriate cramdown interest rate from Dawn-G's expert Franklind Lea ("Lea"), of Tactical Financial Consulting LLC, and from Debtor's expert, Roger Luksik ("Luksik"). Both experts also prepared written reports that were admitted into evidence. And the Court heard testimony and viewed exhibits regarding the feasibility of the Plan.

After the parties completed their presentation of evidence, they filed post-hearing briefs. On August 28, 2012, the parties presented closing arguments. Neither Ammori nor his counsel appeared for the closing arguments, and the Court deemed Ammori to have waived his closing argument. Now that the Debtor and Dawn-G have settled Dawn-G's objections, only the objections to confirmation by Ammori remain pending for decision.

**II. Jurisdiction**

This Court has subject matter jurisdiction over this bankruptcy case under 28 U.S.C. §§ 1334(b), 157(a) and (b)(1), and Local Rule 83.50(a) (E.D. Mich.). This confirmation matter is a core proceeding under, among other possible provisions, 28 U.S.C. § 157(b)(2)(L). This matter also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. §1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings.

---

[32] *See* order entered on March 12, 2012 (Docket # 125).

*See Allard v. Coenen* (*In re Trans-Industries, Inc*.), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This matter is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *id.*, namely, the Bankruptcy Code sections discussed below; including 11 U.S.C. § 1129. And this matter is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *Id.*

## III. Discussion

As the proponent of the Plan, Debtor has the burden of proving, by a preponderance of the evidence, that all of the requirements under 11 U.S.C. § 1129(a) have been satisfied. *See In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 459-63 (Bankr. S.D. Ohio 2011). The Court finds and concludes that Debtor has met that burden, and that Ammori's objections to confirmation must be overruled.

### A. Ammori's objections to confirmation of Debtor's plan

The Court will now discuss each of Ammori's objections to confirmation.

### 1. Ammori's miscellaneous objections

Of Ammori's five arguments objecting to confirmation, three can be rejected without much discussion. First, Ammori argues that the Plan is "ambiguous" in stating the treatment of Ammori's claim and the other claims in Class 2. As Ammori states the argument:

> The Plan's reference to "1%" is ambiguous in that it is not clear whether the plan is proposing that the unsecured creditors will receive 1% of the total amount of their claim or 1% per installment payment or annually.[33]

The Court disagrees. The Plan is not ambiguous. Rather, it clearly says that the total to

---

[33] Docket # 141 at 2.

be paid on the unsecured claims in Class 2 is 1% of the face amount of the claims:

> These claims shall be paid at a total of 1% of face value in 240 equal monthly installments, commencing on the Effective Date, without interest.[34]

There is no doubt about the meaning of this sentence in the Plan. But even if there were any doubt, it would be cleared up by the rest of the Plan's description of the Class 2 treatment. It says that the total of claims in Class 2 is $650,402.21, and that the equal monthly payment by the Debtor to this Class would be $27.10, over 240 months. That equates to a total payment to Class 2 of $6,504.00 ($27.10 x 240) over the life of the Plan. That amount, $6,504.00, is 1% of the total amount of claims in Class 2.

Thus, the Plan is clear in stating that Ammori will be paid a total of 1% of his $179,902.21 claim, which equals $1,799.02, without interest. And this will be paid over 240 equal monthly installments, along with payments on the other claims in Class 2. While this is a very small percentage of Ammori's claim, and is to be paid over a long time, there is nothing unclear in the Plan about what the treatment is.

Ammori's second objection is that the Plan does not pay any interest on the Class 2 claims. Ammori argues that the Plan not only must pay interest to Class 2, but also must pay "a market interest rate."[35] This argument is without merit. There is no legal requirement that Debtor's Plan pay any interest on non-priority unsecured claims, and Ammori cites no authority for his argument. There is one situation when a Chapter 11 debtor must pay all its creditors in full, with interest, namely when the following two conditions are both present: the debtor is

---

[34] Fourth Amended Plan (Docket # 122) at 9.

[35] Docket # 141 at 2.

9

solvent; and the debtor seeks to confirm a plan on a cram-down basis under 11 U.S.C. § 1129(b). In that very unusual situation, case law holds that in order to be "fair and equitable" as required by § 1129(b)(1), a plan must pay all creditors in full, with post-petition interest. *See generally In re BWP Transport, Inc.*, 462 B.R. 225, 233 (Bankr. E.D. Mich. 2011)(citing *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir.2006)).

But clearly this is not such a case. First, the Debtor in this case clearly is not "solvent," and no one has ever argued otherwise. Second, and as discussed below, the Debtor in this case is not seeking to confirm its Plan on a cramdown basis under § 1129(b)(1). So the Debtor need not pay any interest to its general unsecured creditors.

Ammori's third objection is that Debtor's Plan "violates the absolute priority rule and is therefore not fair and equitable [as required by] 11 U.S.C. § 1129(b)(2)."[36] The absolute priority rule is codified in 11 U.S.C. § 1129(b)(2)(B)(ii). The requirement that a plan be "fair and equitable" is codified in 11 U.S.C. §§ 1129(b)(1) and (2). These requirements do not apply at all in this case, however, because no part of § 1129(b) applies. That subsection applies only when a debtor seeks to confirm a plan on a cramdown basis, *i.e.*, over the dissent of a non-accepting class of claims. As the opening sentence of 11 U.S.C. § 1129(b)(1) indicates, § 1129(b) applies only when there is an impaired class of claims that has not accepted the Plan, as required by § 1129(a)(8).

As described in section I.B of this opinion, in this case *all* classes of claims (all of which are impaired,) including Ammori's Class 2, have accepted Debtor's Plan. Thus, Debtor does not seek to confirm, and does not need to confirm, under § 1129(b)'s cramdown provisions, and

---

[36] Docket # 141 at 2.

§ 1129(b) does not apply at all. Thus, neither the "fair and equitable" requirement nor the absolute priority rule apply. This objection by Ammori is therefore overruled.

### 2. Ammori's objection under 11 U.S.C. § 1129(a)(11) (feasibility)

Section 1129(a)(11) requires the Debtor to show that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." "'Although the [Bankruptcy] Code does not use the terms "feasible" or "feasibility," the requirement imposed by § 1129(a)(11) is commonly known as the "'feasibility' test for confirmation.'" *Trenton Ridge Investors*, 461 B.R. at 478 (citations omitted). The feasibility requirement of § 1129(a)(11) is satisfied, if the Debtor demonstrates that there is a "reasonable probability" that the debtor will be able make all of the payments to creditors according to the terms provided in the plan. *Id.* at 478. However,

> [d]ebtors emerging from a Chapter 11 case are, by definition, attempting to overcome difficult financial circumstances. Thus, the proponent of a Chapter 11 plan need not show that success is guaranteed; nor is it fatal for the debtor that a possibility of failure is shown. Rather, when a business seeks to reorganize, only a reasonable assurance of commercial viability is required to establish feasibility for purposes of § 1129(a)(11).
>
> When assessing the future commercial viability of a debtor's business, the question of feasibility under § 1129(a)(11) is fundamentally one of whether the debtor has the ability to meet its future obligations, both as provided for in the plan and as may be incurred in its business operations.

*In re Arts Dairy, LLC*, 432 B.R. 712, 717 (Bankr. N.D. Ohio 2010) (citations omitted); *see also In re Griswold Bldg., LLC*, 420 B.R. 666, 697 (Bankr. E.D. Mich. 2009) (citation omitted). "'Feasibility determinations must be firmly rooted in predictions based on objective fact.'"

11

*Griswold*, 420 B.R. at 697 (quoting *Danny Thomas Properties II L.P. v. Beal Bank, S.S.B.* (*In re Danny Thomas Properties II L.P.*), 241 F.3d 959, 964 (8th Cir.2001) (internal quotation marks and citation omitted)). Factors relevant to a feasibility determination are:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc.* (*In re U.S. Truck Co., Inc.*), 800 F.2d 581, 589 (6th Cir. 1986) (citation omitted); *see also Gen. Elec. Credit Equities, Inc. v. Brice Road Devs., L.L.C.* (*In re Brice Road Devs., L.L.C.*), 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008) (citing *U.S. Truck*, 800 F.2d at 589); *Trenton Ridge Investors*, 461 B.R. at 478. Other factors courts have considered include "the past financial performance of the debtor . . . and the term of the plan." *Griswold*, 420 B.R. at 697 (citation omitted).

Ammori argues that the Plan is not feasible because it is uncontested that Debtor "requires a $200,000 outside cash 'infusion' to be viable, in light of the property improvement plan ("PIP") imposed by the franchisor;" and Debtor's only possible source of a capital infusion is "from a related company – Instream PM, Inc., d/b/a K-4 Construction ("K-4")."[37] According to Ammori, K-4 is a sham corporation, whose viability is questionable, and thus is not a reliable source of the funding for Debtor. Ammori argues that because Debtor cannot meet all of its obligations under the Plan without a capital infusion, and Debtor has not shown that it can obtain

---

[37] Docket # 181 (Br. in Supp. of Ammori's Objection to Confirmation) at 1-2.

12

that infusion, Debtor cannot meet its burden of showing that the Plan is feasible.[38]

The Court finds, however, that Debtor can and will obtain the necessary $200,000 cash infusion from K-4. K-4, in fact, is willing and able to provide that cash infusion. But to eliminate all doubt about this, the Court will require the following as a pre-condition to the entry of an order confirming Debtor's Plan: that K-4, in fact, transfer this $200,000 to the Debtor, and that both Debtor and K-4 confirm, by affidavit, that this has been done, all within 14 days after the filing of this opinion.[39]

The Debtor's recent settlement with secured creditor Dawn-G has resulted in a change in the amount and timing of payments that Debtor must make to Dawn G if the Plan is confirmed. Debtor's Exhibit MM, admitted into evidence during the evidentiary hearing, contains Debtor's latest projections of income, expenses, and required plan payments, designed to show that Debtor will be able to make its required payments under the Plan, and still operate its business. These projections include monthly payments to Dawn-G of $15,737 per month. Under Debtor's Fourth Amended Plan, prior to the recent settlement with Dawn-G, these monthly payments were to continue for 120 months, then to be followed by a balloon payment of $3,790,867.01.[40]

The Court finds that Debtor's projections, as reflected in Exhibit MM,[41] are reliable and

---

[38] *Id.* at 2-8.

[39] In response to the Court's inquiry, made during closing arguments held after the evidentiary hearing, Debtor, through its counsel, agreed to the Court requiring this payment as a condition in the order confirming plan, and stated that the $200,000 would be paid to Debtor immediately, if required by the Court. (No transcript of the August 28, 2012 closing arguments is on file, but an .mp3 audio recording of the closing arguments is posted at Docket # 185.)

[40] Docket # 122 at 8.

[41] In relying on Debtor's Exhibit MM, the Court has considered that exhibit with the corrections discussed during the testimony of Jamal on July 10, 2012; namely that in month 31, the "Cash Position

13

are well-grounded and adequately based on Debtor's historical financial performance.[42]

The Court further finds that Debtor is correct in its contention that its projections "demonstrate the Debtor's ability to meet operating expenses, renovate and re-franchise the hotel, and repay the $200,000 capital contribution from [K-4], all while making its payments under the Plan."[43] This finding applies to the version of Debtor's Plan before it was modified by the recent, post-hearing settlement with Dawn-G.

Debtor's recent settlement with Dawn-G requires Debtor to pay Dawn-G a total of $3.2 million, plus interest of 6.25% per annum. This sum is to be paid by Debtor paying Dawn-G $25,000 within 72 hours after entry of the confirmation order, plus monthly payments of $20,226.18. Such monthly payments are required until the 18th month following the Plan's

---

after Payment of Plan Payments . . ." number should be $65,235, not $85,235; and the "Accumulated Net Cash on Hand" should be $45,235, not $65,235. The error beginning in month 31, and continuing thereafter, in the projections is that Exhibit MM does not subtract the projected repayment of $15,000 per month of K-4's $200,000 capital infusion (which monthly payment ends with a payment of $5,000 in month 43 of the projections) and a projected management fee of $5,000 per month. Both of these projected expenses begin in month 30 of the projections.

[42] The Court agrees with Debtor's contention that Debtor does not need to maintain a cash reserve during the early months of the Plan, in order to meet unexpected maintenance costs. Debtor correctly notes that:

> Jamal Kalabat testified that there does not need to be a maintenance reserve in the early months of the [P]lan projections because the [PIP] takes into account those items that need upkeep, and that there are no items that are likely to require upkeep which would require a significant expenditure by the Debtor. For instance, Jamal Kalabat testified that the roof is covered by warranty, that the water heater is in good condition, that the property is being properly maintained, etc.

Debtor's Br. in Supp. of Confirmation and in Opp'n to Relief From Stay (Docket # 179) at 7 (relying on the testimony of Jamal at the July 10, 2012 hearing (*see* Tr. of 7/10/2012 hearing (Docket # 177) at 138-39)).

[43] Debtor's Br. in Supp. of Confirmation and in Opp'n to Relief From Stay (Docket # 179) at 4.

14

Effective Date,[44] by which time Debtor must pay off the remaining balance.

The Court finds and concludes that even with these changes to the timing and amount of Debtor's required payments to Dawn-G, the Plan still is feasible. The Debtor's projections (Exhibit MM), which include the $200,000 cash infusion from K-4, demonstrate this. In addition, the Debtor had the following resources available to it, which are not included in the projections, to help it make plan payments, as of the last day of testimony in the evidentiary hearing: $104,602 cash in the bank, plus current accounts receivable of $103,000 (as against accounts payable of approximately $49,000).[45]

The Court agrees with Debtor's contention, that even assuming that Debtor's hotel business does not generate enough cash to make required Plan payments at any point during the life of the Plan, the Plan nevertheless is still feasible, because K-4 has guaranteed the payments under the Plan. The Court finds that K-4 is capable of honoring its guarantee. As Debtor correctly points out, the evidence shows, among other things, that K-4 has "$1,063,379.82 in total assets and over $1 million in gross annual income."[46] Even though K-4 is owned and managed by insiders of the Debtor and of the Debtor's owners, the Court finds that K-4 is a real business that generates, and that can in the future generate, sufficient income to honor its guarantee of Debtor's plan payments, in addition to making the $200,000 cash contribution to

---

[44] The Effective Date is defined in the Plan to mean "the 11th calendar day after the Confirmation Order becomes a Final Order." (Docket # 122 at 4, § 1.19).

[45] Testimony of Jamal Tr. 7/10/12 (Docket # 177) at 137.

[46] Debtor's Br. in Supp. of Confirmation and in Opp'n to Relief From Stay (Docket # 179) at 7 (citing Debtor's Exh. EE).

15

Debtor, discussed above.[47]

The Court further finds that the following factors all weigh in favor of finding Debtor's Plan to be feasible: Debtor's capital structure and earning power will be adequate; the relevant economic conditions are and will be sufficiently favorable; and Debtor's current management is competent and well qualified, and is highly likely to continue in place over the life of the Plan.

Based on all the foregoing, the Court finds that Debtor has demonstrated that there is at least a "reasonable probability" that the Debtor will be able make all of the payments to creditors according to the terms provided in the [P]lan. *See Trenton Ridge Investors*, 461 B.R. at 478. The Court finds that the Plan is feasible, and that it satisfies the requirement of 11 U.S.C. § 1129(a)(11). Ammori's objection to the contrary is overruled.

### 3. Ammori's objection under 11 U.S.C. § 1129(a)(3)(good faith)

Ammori objects that the Plan is not proposed in good faith as required by § 1129(a)(3), *because of* the four alleged deficiencies discussed in sections III.A.1 and III.A.2 of this opinion, above.[48] Because the Court has rejected Ammori's arguments regarding the four alleged deficiencies, it also must overrule Ammori's "good faith" objection.

Section 1129(a)(3) requires the Debtor to show that "[t]he plan has been proposed in good faith and not by any means forbidden by law."

---

[47] The Court also finds from all the evidence presented that there is a reasonable probability that Debtor will be able, through refinancing with Dawn-G or another financing source, to make the balloon payment that will be due to Dawn-G 18 months after the Plan's effective date.

[48] *See* "Ammori's Second Amended Objections to Confirmation of Fourth Amended Debtor's Combined Disclosure Statement and Plan of Reorganization" (Docket # 141 at 2). The Court notes that in Ammori's post-hearing brief in support of his objections to confirmation of Debtor Fourth Amended Plan, Ammori does not discuss the good faith requirement for confirmation at all. His brief only discusses the feasibility requirement. (*See* "Brief of Unsecured Creditor Farook Ammori in Support of His Objections to Confirmation" (Docket # 181)).

> The Bankruptcy Code does not define the term "good faith," and the Sixth Circuit has not defined it for purposes of § 1129(a)(3). But "the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."

*Trenton Ridge Investors*, 461 B.R. at 468 (quoting, in part, *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984)). "'Two primary purposes of chapter 11 relief are the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims.'" *Id.* at 469 (quoting *Fields Station LLC v. Capitol Food Corp. of Fields Corner* (*In re Capitol Food Corp. of Fields Corner*), 490 F.3d 21, 25 (1st Cir. 2007), and citing *Bonner Mall P'ship v. U.S. Bancorp Mortg. Co.* (*In re Bonner Mall P'ship*), 2 F.3d 899, 916 (9th Cir. 1993)). In making the good faith determination, courts examine the "totality of the circumstances." *Id.* at 468-69.

The Court finds and concludes that under the totality of the circumstances, the Debtor's Plan, as modified by the recent settlement with Dawn-G, has been proposed in good faith. The Plan, which has been accepted by every class of creditors, serves the primary purposes of Chapter 11, and should be confirmed.

**IV. Conclusion**

For the reasons stated in this opinion, the Court overrules all of Farook Ammori's objections to confirmation, and the Court will confirm Debtor's Plan, as modified by Debtor's recent settlement with secured creditor Dawn-G, subject to the pre-condition described in section III.A.2 of this opinion (regarding K-4's transfer of the $200,000 to Debtor). The Court will enter an order that is consistent with this opinion.

**Signed on August 1, 2013**                    /s/ Thomas J. Tucker
                                                **Thomas J. Tucker**
                                                **United States Bankruptcy Judge**